1  COOLEY LLP
   JEFFREY M. GUTKIN (216083)
2  (jgutkin@cooley.com)
   AARTI REDDY (274889)
3  (areddy@cooley.com)
   AMY M. SMITH (287813)
4  (amsmith@cooley.com)
   MORGAN LEWIS (322205)
5  (melewis@cooley.com)
   JULIA M. IRWIN (352861)
6  (JIrwin@cooley.com)
   3 Embarcadero Center, 20th Floor
7  San Francisco, California 94111-4004
   Telephone:    +1 415 693 2000
8  Facsimile:    +1 415 693 2222

COOLEY LLP
JORGE L. SARMIENTO (*Pro Hac Vice* Pending)
(jsarmiento@cooley.com)
55 Hudson Yards
New York, NY 10001-2157
Telephone:    +1 212 479 6000
Facsimile:    +1 212 479 6275

9  Attorneys for Defendant
   LinkedIn Corporation

10

11  UNITED STATES DISTRICT COURT

12  NORTHERN DISTRICT OF CALIFORNIA

13

14  J.P. individually and on behalf of all others
   similarly situated,

15             Plaintiff,

16

17       v.

18  LINKEDIN CORPORATION,

19             Defendant.

Case No.

**DEFENDANT LINKEDIN CORPORATION'S NOTICE OF REMOVAL**

Santa Clara County Superior Court
Case No. 24CV447940

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE**

2   **NOTICE THAT**, pursuant to 28 U.S.C. §§ 1332(d), 1441, 1446 and 1453(b), defendant LinkedIn

3   Corporation ("LinkedIn" or "Defendant") hereby removes the above-captioned civil action from

4   the Superior Court of the State of California, County of Santa Clara (the "Superior Court"), where

5   the action is currently pending, to the United States District Court for the Northern District of

6   California, San Jose Division.  For the reasons set forth below, this Court has jurisdiction over this

7   action pursuant to 28 U.S.C. § 1332(d)(2).  In filing this Notice of Removal, Defendant expressly

8   reserves all rights to respond to and seek dismissal of this lawsuit.

9   **I.    BACKGROUND**

10        **A.    Nature of the Suit**

11        1.    On or about September 23, 2024, Plaintiff J.P. filed a putative class action complaint

12   in the Superior Court entitled *J.P., individually and on behalf of all others similarly situated v.*

13   *LINKED IN CORPORATION*, Case No. 24CV447940 (the "Complaint" or "Compl.").  A true and

14   correct copy of the Complaint served upon Defendant is attached hereto as **Exhibit 1**.

15        2.    Pursuant to 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings,

16   and orders served upon Defendant in the state court and not previously referenced are attached

17   hereto, identified as **Exhibits 2**, **3**, **4** and **5**.

18        3.    Plaintiff alleges that he is an individual domiciled in Beverly Hills, California.

19   Compl. ¶ 6.

20        4.    Plaintiff "brings this action on behalf of all LinkedIn account holders in the United

21   States who booked a therapy appointment on www.headway.co[]" (the "Website").  Compl. ¶ 48.

22   According to Plaintiff, through the use of the "LinkedIn Insight Tag," "LinkedIn intentionally

23   intercepted" "sensitive and confidential communications, including information concerning the

24   medical conditions for which [Website users] were seeking therapy."  *Id.* ¶¶ 3, 7.  Based on these

25   allegations, he pleads that "LinkedIn eavesdropped and/or recorded confidential communications

26   through an electronic amplifying or recording device" in violation of the California Invasion of

27   Privacy Act ("CIPA"), Cal. Penal Code §§ 631–32, and "intentionally invaded Plaintiff's and Class

28   Members' privacy rights under the California Constitution." *Id.* ¶¶ 77, 84.

5.      By filing this Notice of Removal, Defendant does not admit that Plaintiff's allegations have any merit whatsoever, and expressly reserves the right to challenge all such allegations on any and all grounds available.

6.      Nothing in this Notice of Removal shall constitute a waiver of Defendant's right to assert any defense or argument, or avail itself of any substantive or procedural right, including but not limited to motions pursuant to Federal Rule of Civil Procedure 12, as the case progresses.

7.      If the Court considers a remand, Defendant requests the Court issue an order to show cause as to why the case should not be remanded, giving the parties the opportunity to present briefing and argument prior to any remand.

**B.      Timeliness of Removal**

8.      This Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b). Plaintiff filed the Complaint on September 23, 2024.  *See* **Exhibit 1**.  Plaintiff served the Complaint on Defendant on October 3, 2024. *See* **Exhibit 4**.  Defendant filed this Notice of Removal within thirty (30) days of service, as required.  28 U.S.C. § 1446(b); *see, e.g.*, *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347–48 (1999).

**II.      GROUNDS FOR REMOVAL**

9.      This Court has original jurisdiction over the action under 28 U.S.C. § 1332(d)(2), and the action is removable to this Court pursuant to 28 U.S.C. § 1453(b).

10.      A class action filed in state court is removable to federal district court under the Class Action Fairness Act ("CAFA") if: (1) the putative class includes more than 100 members, (2) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs," and (3) "any member of a class of plaintiffs" is diverse "from any defendant" in any one of three statutorily enumerated ways. 28 U.S.C. § 1332(d).  The CAFA requirements are satisfied here.

**B.      This Action Meets the "Class Action" Definition under CAFA.**

11.      This action is a "class action." CAFA provides:

[T]he term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action . . . .

1    28 U.S.C. § 1332(d)(1)(B).  CAFA further provides "[t]his subsection shall apply to any class action

2    before or after the entry of a class certification order by the court with respect to that action."  28

3    U.S.C. § 1332(d)(8).

4        12.    Plaintiff filed this action as a putative class action.  *See* **Exhibit 1**, Compl. at 1 (titled

5    "Class Action Complaint"); *id.* at 2 (Plaintiff "brings this class action complaint . . . ."), *id.* ¶¶ 48–

6    57 (section entitled "Class Action Allegations").  Plaintiff also asserts that he seeks to represent a

7    class, defined as "all LinkedIn account holders in the United States who booked a therapy

8    appointment on www.headway.co[.]" *Id.* ¶ 48.  Accordingly, the complaint qualifies as a "class

9    action" under CAFA.

10       **C.    The Proposed Class Exceeds 100 Members.**

11       13.    The Complaint's allegations satisfy the first requirement for removal under CAFA

12   that the putative class includes more than 100 members.  28 U.S.C. § 1332(d)(5).  Plaintiff

13   affirmatively asserts that putative class members "number in the thousands."  Compl. ¶ 51.

14       14.    While LinkedIn does not concede liability, the appropriateness of class treatment in

15   any respect, or the validity of Plaintiff's claims for relief, Plaintiff's Complaint alleges that there

16   are more than 100 proposed class members.  Numerous courts have relied on similar allegations in

17   finding that the underlying complaint satisfies CAFA's numerosity requirement.  *See, e.g.*,

18   *Kuxhausen v. BMW Financial Services NA LLC*, 707 F.3d 1136, 1140 (9th Cir. 2013) (finding

19   numerosity requirement under CAFA was met for jurisdictional purposes by complaint statement

20   seeking to "'provide remedies for hundreds of affected consumers'" and rejecting defendant's

21   contention of indeterminacy with respect to numerosity because complaint stated that the "'exact

22   number'" of class members was unknown); *Tompkins v. Basic Rsch. LLC,* No. S–08–244

23   LKK/DAD, 2008 WL 1808316, at *3 (E.D. Cal. Apr. 22, 2008) (CAFA numerosity satisfied for

24   jurisdictional purposes because the allegation "a class of 'thousands of persons'" implies "a logical

25   minimum of 2,000 class members"); *Phillips v. Wellpoint, Inc.*, No. 10-cv-357-JPG, 2010 WL

26   4877718, at *2 (S.D. Ill. Nov. 23, 2010) (relying on allegation in plaintiff's complaint that "the

27   proposed class will exceed 20,000 policyholders and group members" to support a finding of

28   jurisdiction under CAFA).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.    The Amount in Controversy Exceeds $5 Million.**

15.    The Complaint's allegations also satisfy the second requirement for removal under CAFA because the amount in controversy exceeds $5 million.  28 U.S.C. § 1332(d)(2).  The claims of the individual class members are aggregated to determine whether the matter in controversy exceeds $5 million.  28 U.S.C. § 1332(d)(6).

16.    To meet the amount in controversy threshold, a notice of removal must include only "'a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.'" *Schneider v. Ford Motor Co.*, 756 F. App'x 699, 700 (9th Cir. 2018) (quoting *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014)).  "In measuring the amount in controversy, a court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint."  *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1205 (E.D. Cal. 2008).  "The ultimate inquiry is what amount is put 'in controversy' by the plaintiff's complaint, not what a defendant will *actually owe*." *Id*; *accord Deehan v. Amerigas Partners, L.P.*, No. 08cv1009 BTM(JMA), 2008 WL 4104475, at *2 (S.D. Cal. Sept. 2, 2008); *Muniz v. Pilot Travel Centers LLC*, No. CIV. S-07-0325-FCD EFB, 2007 WL 1302504, at *3 (E.D. Cal. May 1, 2007).

17.    A court may consider various forms of relief sought in the complaint to determine the amount in controversy, including damages, compliance with injunctions, attorneys' fees awarded under fee-shifting statutes or contract, and treble and exemplary damages.  *See Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 794 (9th Cir. 2018) ("[T]he amount in controversy may include damages, costs of compliance with injunctions, and attorneys' fees awarded under contract or fee shifting statutes.");  *see also, e.g.*, *Chess v. CF Arcis IX LLC*, No. 20-cv-01625-CRB, 2020 WL 4207322, at *4 (N.D. Cal. July 22, 2020) ("When available by statute, treble damages can be included in the calculation for the amount in controversy.") (citing *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1046 (9th Cir. 2000)); *Greene v. Wells Fargo Bank, N.A.*, No. 18-cv-06689-JSC, 2019 WL 1331027, at *5 (N.D. Cal. Mar. 25, 2019) ("'It is well established that punitive damages are part of the amount in controversy in a civil action.'") (quoting *Gibson v. Chrysler Corp.*, 261 F.3d 927, 945 (9th Cir. 2001)).

1     18.    Further, a defendant's burden of proof on removal "is not daunting, as courts recognize that . . . a removing defendant is not obligated to research, state, and prove the plaintiff's claims for damages." *Korn*, 536 F. Supp. 2d at 1204–05 (internal quotation marks omitted). Indeed, "a removing defendant need not meet a preponderance standard where, as here, the amount in controversy can be determined on the face of the pleadings." *Chess*, 2020 WL 4207322, at *4. Rather, "'[t]he sum claimed by the plaintiff controls so long as the claim is made in good faith.'" *Id*. (quoting *Crum v. Circus Circus Enters.*, 231 F.3d 1129, 1131 (9th Cir. 2000)).

19.    Given that Plaintiff alleges that the "members of the putative Class number in the thousands[,]" calculation of the amount in controversy is straightforward. Compl. ¶ 51.

20.    In Counts I and II regarding violations of CIPA, Cal. Penal Code §§ 631–32, Plaintiff alleges that Defendant is liable to Plaintiff and other Class Members "in the amount of $5,000 dollars per violation or three times the amount of actual damages, whichever is greater." Compl. ¶¶ 69, 80. As such, the alleged minimum aggregated statutory damages alone ($5,000 or more per class member) would exceed the $5 million statutory threshold for an alleged class of 1,000 individuals because $5,000 times 1,000 equals $5,000,000, and here, Plaintiff alleges a class of not just 1,000 members, but one "in the thousands." Compl. ¶ 51.

21.    Plaintiff additionally seeks, *inter alia*: (i) "punitive damages"; (ii) "an order requiring Defendant to disgorge revenues and profits wrongfully obtained"; (iii) "injunctive relief as pleaded or as the Court may deem proper"; and (iv) "an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit[.]" Compl. at 20–21. The amount of these requested punitive damages, disgorgement, and costs of compliance with Plaintiff's requested injunction further enlarge the amount in controversy—by a potentially significant amount if applied to a putative class of "thousands" of members.

22.    Without conceding liability, the validity of Plaintiff's claim for relief, or appropriateness of class treatment in any respect, the face of the Complaint plausibly establishes that the amount in controversy exceeds $5,000,000. *See* 28 U.S.C. § 1332(d)(2).

**E.    There Is Minimal Diversity.**

23.    The class definition in Plaintiff's complaint establishes the third requirement for

1    removal under CAFA—minimal diversity—because "any member of a class of plaintiffs is citizen

2    of a State different from [the] Defendant." 28 U.S.C. § 1332(d)(2)(A); *United Steel, Paper &*

3    *Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. Shell*

4    *Oil Co.*, 602 F.3d 1087, 1090–91 (9th Cir. 2010) (finding that to achieve its purposes, CAFA

5    provides expanded original diversity jurisdiction for class actions meeting the minimal diversity

6    requirement set forth in 28 U.S.C. § 1332(d)(2)).

7        24.    For purposes of establishing diversity jurisdiction, a corporation is deemed to be a

8    citizen of any state in which it has been incorporated and of any state where it has its principal place

9    of business. 28 U.S.C. § 1332(c)(1). Defendant is now and was at the time of the filing of this

10   action, a Delaware corporation with its principal place of business located in Sunnyvale, California.

11   Compl. ¶ 8.

12       25.    An individual is a citizen of the state in which she is domiciled. *Boon v. Allstate Ins.*

13   *Co.*, 229 F. Supp. 2d 1016, 1019 (C.D. Cal. 2002) (citing *Kanter v. Warner-Lambert Co.*, 265 F.3d

14   853, 857 (9th Cir. 2001)). For purposes of diversity of citizenship jurisdiction, citizenship is

15   determined by the individual's domicile at the time that the lawsuit is filed. *Armstrong v. Church*

16   *of Scientology Int'l*, 243 F.3d 546, 546 (9th Cir. 2000).  Further, the citizenship of putative class

17   members is assessed in determining whether minimal diversity is satisfied.  *Broadway Grill, Inc.*

18   *v. Visa Inc.*, 856 F.3d 1274, 1275–76  (9th Cir. 2017).

19       26.    Although Plaintiff alleges he is domiciled in California, Compl. ¶ 6, his Complaint

20   further asserts that he seeks to represent a nationwide class, defined as "all LinkedIn account

21   holders in the United States who booked a therapy appointment on www.headway.co[.]" Compl. ¶

22   48.  Given that Plaintiff seeks to represent a nationwide class, there is at least one putative class

23   member that is diverse from LinkedIn.

24       27.    Indeed, Plaintiff's counsel in this action expressly conceded the existence of non-

25   California putative class members in a copycat filing **on the same date this was filed**.    In that

26   complaint, plaintiff asserts similar claims against TherapyMatch on behalf of "an Illinois citizen"

27   who sought to certify a class of "all LinkedIn account holders in the United States, **excluding**

28   **California**, who booked a therapy appointment on www.headway.co[.]" *See A.G., individually and*

*on behalf of all others similarly situated v. THERAPYMATCH, INC. d/b/a HEADWAY*, No. 1:24-CV-08776 JHL, (N. D. Ill. Sep. 23, 2024), ECF No. 1, ¶¶ 1, 7, 64 (emphasis added).  That complaint further alleges that the "members of the proposed Class are geographically dispersed throughout the United States" and that "Plaintiff reasonably estimates that there are thousands of individuals that are members of the proposed Class." *Id.* ¶ 68.  A true and correct copy of the complaint in that action is attached hereto as **Exhibit 6**.

28.    Therefore, diversity of citizenship exists under CAFA because at least one member of the putative class—A.G.—is a citizen of Illinois, a state different than the Defendant's. 28 U.S.C. § 1332(d)(2)(A).

## III.    VENUE AND INTRADISTRICT ASSIGNMENT

29.    Removal to this judicial district is proper because this district includes the County of Santa Clara, where the action is currently pending. *See* 28 U.S.C. § 84(a); 28 U.S.C. § 1441(a). Removal to this division is proper because this division includes the County of Santa Clara. *See* N.D. Cal. L.R. 3-2(e).

## IV.    NOTICE TO THE SUPERIOR COURT AND TO PLAINTIFF

30.    Pursuant to 28 U.S.C. § 1446(d), Defendant is filing written notice of the removal of this case with the Clerk of the Superior Court of California for the County of Santa Clara and serving such notice upon Plaintiff. *See* **Exhibit 7** attached hereto.

## V.    CONCLUSION

31.    Removal to this Court is proper under CAFA jurisdiction. If any question arises as to the propriety of the removal of this action, Defendant requests the opportunity to present a brief and oral argument in support of its position that this case is subject to removal.

Dated: November 1, 2024                COOLEY LLP


By:    /s/ Jeffrey M. Gutkin
          Jeffrey M. Gutkin

Attorneys for Defendant
LinkedIn Corporation

# Exhibit 1

E-FILED
9/23/2024 3:35 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
24CV447940
Reviewed By: L. Ayala

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Counsel for Plaintiff*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| J.P., individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>LINKEDIN CORPORATION,<br><br>                    Defendant. | Case No.   24CV447940<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT** |

Plaintiff J.P. ("Plaintiff") brings this class action complaint on behalf of himself and all other persons similarly situated against Defendant LinkedIn Corporation ("LinkedIn" or ("Defendant").  Plaintiff brings this action based on personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      Plaintiff brings this suit on behalf of all LinkedIn users who live in the United States and who scheduled a therapy appointment through the website www.headway.co (the "Website"). The Website is owned and operated by Therapymatch, Inc. ("Headway").

2.      When individuals seek therapy, they often share sensitive personal information, including mental health history, personal struggles, and other confidential medical information. Data privacy is especially vital when booking therapy online, primarily due to the sensitive nature of this protected medical information.  When patients engage in online therapy, they must be able to trust that their information is protected from unauthorized disclosure to third parties.  When patients know their information is secure, they are more likely to pursue the support they need without fear of judgment or exposure.  This is particularly important in therapy, where societal stigma around mental health can already be a barrier to accessing care.

3.      Information related to therapy appointments is protected by state and federal law. Given these protections, patients reasonably expect that information related to their therapy appointments will remain confidential.  However, unbeknownst to Plaintiff and members of the putative class, LinkedIn intentionally intercepted these sensitive and confidential communications, including information concerning the medical conditions for which they were seeking therapy. LinkedIn failed to receive consent for these interceptions, and thereby engaged in conduct that expressly contravened its own terms and representations.

4.      LinkedIn develops, owns, and operates "the world's largest professional network with more than 1 billion members in more than 200 countries and territories worldwide."[1]

---

[1] LINKEDIN, ABOUT, https://about.linkedin.com/?trk=homepage-basic_directory_aboutUrl.

LinkedIn is also an advertising company that touts its ability to deliver targeted marketing to specific users.

5.      Defendant intercepted this confidential information for target advertising purposes. Plaintiff brings this action for legal and equitable remedies resulting from these illegal acts.

## PARTIES

6.      Plaintiff J.P. is domiciled in Beverly Hills, California.  Plaintiff maintained a LinkedIn account at all relevant times.  When Plaintiff created his LinkedIn account he agreed to LinkedIn's User Agreement, which provides that "You and LinkedIn agree that the laws of the State of California, U.S.A….shall exclusively govern any dispute relating to this Contract and/or the Services."[2]  LinkedIn's "Services," includes those related to its software code known as the LinkedIn Insight Tag.[3]

7.      Plaintiff scheduled several therapy appointments through the Website in 2021 and 2022.  When searching for a therapist on the Website, Plaintiff disclosed that he was looking for mental health treatment related to "anxiety" and "depression."  Unbeknownst to Plaintiff, LinkedIn was tracking his private activity on Headway's Website using the LinkedIn Insight Tag.  LinkedIn used this software to track Plaintiff and intercept his communications with Headway, including communications that contained confidential information related to his therapy appointments, such as the reasons for the appointment and the specific therapist that was selected.  LinkedIn never received consent from Plaintiff or received permission to track or sell his data to advertisers. LinkedIn's acts and practices, as described herein, are an egregious breach of Plaintiff's privacy.

8.      Defendant LinkedIn Corporation is a Delaware corporation with its principal place of business located in Sunnyvale, California.  Defendant LinkedIn at all times knew that the incorporation of its software onto the Headway Website would result in its interception of confidential medical information.  Defendant LinkedIn, as the creator of its software and the LinkedIn Insight Tag, knew that it intercepted users' interactions on the Website that incorporated

---

[2] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement#dispute
[3] Id.

its technology.  Defendant LinkedIn is well aware of the dangers of incorporating such technology

on websites that offer medical and health services, but continues to do so.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this class action.  This Court has

personal jurisdiction over the parties because Defendant resides in California, Plaintiff submits to

the jurisdiction of the Court, and because Defendant, at all times relevant hereto, has systematically

and continually conducted, and continues to conduct, business in California.

10.      Venue is proper in this Court pursuant to Civil Code §§ 395 and 395.5.  Defendant

conducts business in this County and throughout the State of California and its principal place of

business is in this County.

## FACTUAL ALLEGATIONS

**A.      Background of the California Information Privacy Act ("CIPA")**

11.      The CIPA prohibits "any person" from "willfully and without the consent of all

parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or

meaning of any message, report, or communication while the same is in transit or passing over any

wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or

attempts to use, in any manner, or for any purpose, or to communicate in any way, any information

so obtained, or who aids, agrees with, employs, or conspires with any person or persons to

unlawfully do, or permit, or cause to be done any of the acts or things mentioned[.]" § 631(a).

12.      To establish liability under California Penal Code Section 631(a), a plaintiff need

only establish that the defendant, "by means of any machine, instrument, or contrivance, or in any

other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> Or

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning

of any message, report, or communication while the same is in transit or passing over any wire, line or cable, or is being sent from, or received at any place within this state,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

13.     Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email.  *See Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (the CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (the CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607–08 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

14.     Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation under the CIPA. Cal. Penal Code § 637.2.

**B.    LinkedIn's Platform and Business Tools**

15.     LinkedIn markets itself as "the world's largest professional network on the internet[.]"[4]  But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network.  LinkedIn has moved into the marketing and advertising space, and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[5]  Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[6]

---

[4] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?,
https://www.linkedin.com/help/linkedin/answer/a548441#.

[5] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[6] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023),
https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

16.     According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and ultimately, higher conversion rates." [7]  Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement.  To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[8]  LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience.  The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[9]

17.     As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[10]

18.     The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, and LinkedIn Audience Network.[11]

19.     Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allows marketers and advertisers, including healthcare providers and insurance companies, to target potential customers.[12]

---

[7] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[8] LINKEDIN, *supra* note 5.

[9] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[10] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[11] *See id.*

[12] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based

20.     For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[13]  According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[14]

21.     In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[15]  That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[16]

22.     According to LinkedIn, the LinkedIn Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[17]  LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[18]

---

on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

[13] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

[14] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

[15] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings#:~:text=And%20LinkedIn%20Marketing%20Solutions%20surpassed,revenue%20for%20the%20first%20time.

[16] Dencheva, *supra* note 6.

[17] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[18] LINKEDIN, LINKEDIN INSIGHT TAG FAQS, https://www.linkedin.com/help/lms/answer/a427660.

23.     LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[19]  A critical feature allows the LinkedIn Insight Tag to track users, even when third-party cookies are blocked.[20]   LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[21]  Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn.  Doing so ensures that the third-party cookie-blocking functions of modern web browsers do not prevent LinkedIn from collecting data through its software.[22]  Instead, the LinkedIn Insight Tag is shielded with the same privacy exemptions offered to first-party cookies.

24.     When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

25.     These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

26.     The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies.  Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[23]

27.     For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[24]  Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[25]

---

[19] LINKEDIN, *supra* note 17.

[20] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[21] *See id.*

[22] *See id.*

[23] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[24] *See id.*

[25] *See id.*

28.     A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details.  Based on information it obtains through the LinkedIn Insight Tag, Defendant LinkedIn is able to target its account holders for advertising.

29.     LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully-disclosed information.  In fact, LinkedIn expressly warrants the opposite.

30.     When first signing up, a user agrees to the User Agreement.[26]  By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[27] and the Cookie Policy.[28]  For California residents, LinkedIn also publishes a California Privacy Disclosure.[29]

31.     LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[30]

32.     The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[31]  LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[32]

33.     However, LinkedIn offers an express representation: "**We will only collect and process personal data about you where we have lawful bases.**"[33]

---

[26] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[27] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[28] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

[29] LINKEDIN, CALIFORNIA PRIVACY DISCLOSURE, https://www.linkedin.com/legal/california-privacy-disclosure.

[30] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[31] *Id.*

[32] *Id.*

[33] *Id.* (emphasis added).

34.     Despite this explicit representation, LinkedIn intentionally intercepts and receives sensitive and unlawfully-disclosed information in violation of state and federal privacy laws.

35.     Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

**C.     How LinkedIn Intercepted Plaintiff's and Class Members'**
**Protected Health Information**

36.     Headway is an online healthcare operator that connects patients with therapists. Upon entering the Website, Headway warrants that it will help "find your mental health provider."

37.     To begin, patients must provide Headway with certain information to find available therapists that will fit their mental health needs, including their location, concerns, and insurance carrier.

**Figure 1**:



38.    Unbeknownst to consumers, LinkedIn was tracking their activity the moment they entered the Headway Website.

39.    For example, the LinkedIn Insight Tag was embedded on the Website, which allowed LinkedIn to intercept and record "click" events.  Click events detail information about which page on the Website the patient was viewing as well as the selections they were making.

40.    Through the LinkedIn Insight Tag, Defendant intercepted consumers confidential information related to their therapy appointments in order to monetize that data for targeted advertising.

**Figure 2:**

```
Data Sent: Concerns
        "signalType": "CLICK",
        "href": "",
        "domAttributes": {
                "elementSemanticType": null,
                "elementValue": null,
                "elementType": null,
                "tagName": "LI",
                "backgroundImageSrc": null,
                "imageSrc": null,
                "imageAlt": null,
                "innerText": "ADD/ADHD",
                "innerText": "Anxiety",
                "elementTitle": null,
                "cursor": "pointer"
```

41.    Once a consumer enters their private information and clicks the "find care" link, they are brought to additional webpages to select their preferred therapist.

42.    After providing additional details and confirming an appointment with their preferred therapist, LinkedIn intercepts that information through the LinkedIn Insight Tag as well.

**Figures 3 and 4:**

"signalType": "CLICK",
"href": "/providers/arnold-fosah?preferredCarrierId=1&state=CALIFORNIA",
"domAttributes": {
"elementSemanticType": null,
"elementValue": null,
"elementType": null,
"tagName": "A",
"backgroundImageSrc": null,
"imageSrc": null,
"imageAlt": null,
"innerText": "ARNOLD FOSAH\nNurse Practitioner, RN, MSN, PMHNP-BC\nAccepts your insurance: Aetna\nSpecialties: ADD/ADHD, Anxiety, PTSD, Stress, Trauma\nAffirming\nHolistic\nWarm\nNext Available:\nJul 5th, 3:00pm",
"elementTitle": null,
"cursor": "pointer"

43.     As shown in Figure 4, LinkedIn intercepts several pieces of confidential information, including the name of the patient's therapist, the medical reasons for the therapy appointment, and the date and time of the appointment.

44.     These interceptions also included the li_sugr and lms_ads cookies, which LinkedIn utilizes to identify its account holders for targeted advertising.

45.     LinkedIn incorporated the information it intercepted from the Headway Website into its marketing tools to fuel its targeted advertising service.

46.     Plaintiff never consented, agreed, authorized, or otherwise permitted LinkedIn to intercept his confidential health information.

47.     By law, Plaintiff is entitled to privacy in his protected health information and confidential communications.  LinkedIn deprived Plaintiff of his privacy rights when it implemented a system that surreptitiously tracked and recorded Plaintiff's and other online consumers' confidential communications, personally identifiable information, and protected health information.  Plaintiff did not discover that Defendant intercepted his personally identifiable information and protected health information, until around July 2024.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action on behalf of all LinkedIn account holders in the United States who booked a therapy appointment on www.headway.co (the "Class").

49.     Excluded from the Class is Defendant, the officers and directors of the Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which either Defendant have or had a controlling interest.

50.     Plaintiff is a member of the Class he seeks to represent.

51.     Members of the putative Class are so numerous that their individual joinder herein is impracticable.  Based on information and Plaintiff's belief, members of the putative Class number in the thousands.  The precise number of putative class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Putative Class members may be notified of the pendency of this action by mail and/or publication through the distribution of Defendant's records.

52.     Common questions of law and fact exist as to all putative Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

    a.   Whether LinkedIn's conduct violates the California Invasion of Privacy Act, Cal. Penal Code § 630, *et seq*.;

    b.   Whether LinkedIn learned the contents of Plaintiff's and Class members' communications with Headway;

    c.   Whether LinkedIn used the information it learned from the contents of Plaintiff's and Class members' communications with Headway; and

    d.   Whether LinkedIn intentionally used an electronic amplifying or recording device to eavesdrop or record Plaintiff's and Class members' confidential communications with Headway without the Plaintiff's and Class members' consent.

53.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct.  Plaintiff has no interests antagonistic to the interests of the other members of the Class.  Plaintiff and all members of the Class have sustained economic injury arising out of Defendant's violations of statutory law as alleged herein.

54.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the putative Class members he seeks to represent, he has retained counsel competent and experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

55.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the putative members of the Class.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial

system presented by the complex legal and factual issues of this case. Individualized litigation also presents potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims are consistently adjudicated.

56.     California law applies to the entirety of the Class. California's substantive laws apply to every member of the Class, regardless of where in the United States the Class member resides. Defendant's own User Agreement explicitly states that "[i]n the unlikely event we end up in a legal dispute . . . you and LinkedIn agree to resolve it in California courts using California law[.]"[34] By choosing California law for the resolution of disputes covered by its User Agreement, LinkedIn concedes that it is appropriate for this Court to apply California law to the instant dispute to all Class members. Further, California's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class members under the Due Process Clause, see U.S. Const. amend. XIV, § 1, and the Full Faith and Credit Clause. *See* U.S. Const. art. IV, § 1, of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, the claims asserted by the Plaintiff and all Class members thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair. Defendant's decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible. The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Class and California has the greatest interest in applying its laws here.

57.     Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

---

[34] LINKEDIN, USER AGREEMENT, note 2.

**COUNT I**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631**

58.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class against Defendant.

59.     The California Invasion of Privacy Act (the "CIPA") is codified at California Penal Code Sections 630 to 638.  The CIPA begins with its statement of purpose—namely, that the purpose of the CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . ."  Cal. Penal Code § 630.

60.     A person violates California Penal Code Section 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . .[35]

61.     To avoid liability under section 631(a), a defendant must show it had the consent of all parties to a communication.

62.     At all relevant times, LinkedIn tracked and intercepted Plaintiff's and Class members' internet communications while using www.headway.co to book a therapy appointment. These communications were intercepted without the authorization and consent of Plaintiff and Class members.

---

[35] Cal. Penal Code § 631(a).

63.     Through these interceptions, LinkedIn intended to learn some meaning of the content the visitors requested.

64.     The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the LinkedIn Insight Tag fall under the broad catch-all category of "any other manner":

a.     The computer codes and programs LinkedIn used to track Plaintiff and Class members' communications while they were navigating www.headway.co;

b.     Plaintiff's and Class members' browsers;

c.     Plaintiff's and Class members' computing and mobile devices;

d.     LinkedIn's web and ad servers;

e.     The web and ad servers from which LinkedIn tracked and intercepted Plaintiff's and Class members' communications while they were using a web browser to access or navigate www.headway.co;

f.     The computer codes and programs used by LinkedIn to effectuate its tracking and interception of Plaintiff's and Class members' communications while they were using a browser to visit www.headway.co; and

g.     The plan LinkedIn carried out to effectuate its tracking and interception of Plaintiff's and Class members' communications while they were using a web browser or mobile device to visit www.headway.co.

65.     At all relevant times, LinkedIn, though the LinkedIn Insight Tag, intentionally tapped or made unauthorized connections with, the lines of internet communications between Plaintiff and Class members and the Headway Website without the consent of all parties to the communication.

66.     LinkedIn, willfully and without the consent of Plaintiff and Class members, read or attempted to read, or learn the contents or meaning of Plaintiff's and Class members' communications to Headway while the communications are in transit or passing over any wire, line or able, or were being received at any place within California when it intercepted Plaintiff's and Class members' communications and data with Headway.

67.     LinkedIn used or attempted to use the communications and information they received through their tracking technology, including to supply advertising services.

68.     The patient communication information intercepted through the LinkedIn Insight Tag, such as information related to therapy appointments, constituted protected health information.

69.     As a result of the above violations, Defendant is liable to Plaintiff and other Class members in the amount of $5,000 dollars per violation or three times the amount of actual damages, whichever is greater.  Additionally, California Penal Code Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

70.     Under the CIPA, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT II
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 632

71.      Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class against Defendant.

72.     Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

73.     Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

74.     Plaintiff's and Class members' communications to Headway, including their sensitive personal and health information, such as information related to therapy appointments,

were confidential communications for purposes of § 632, because Plaintiff and Class members had an objectively reasonable expectation of privacy in this data.

75.    Plaintiff and Class members expected their communications to Headway to be confined to Headway in part, due to the protected nature of the health information at issue. Plaintiff and Class members did not expect third parties, like LinkedIn, to secretly eavesdrop upon or record this confidential information and their communications.

76.    LinkedIn's tracking technology, i.e., the LinkedIn Insight Tag, are all electronic amplifying or recording devices for purposes of § 632.

77.    By contemporaneously intercepting and recording Plaintiff's and Class members' confidential communications to Headway through this technology, LinkedIn eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

78.    At no time did Plaintiff or Class members consent to LinkedIn's conduct, nor could they reasonably expect that their communications to Headway would be overheard or recorded by LinkedIn.

79.    LinkedIn utilized Plaintiff's and Class members' sensitive personal and health information for its own purposes, including for targeted advertising.

80.    Plaintiff and Class members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

81.    Plaintiff and Class members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and Class members' sensitive data has been collected, viewed, accessed, stored, by LinkedIn, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law.  Plaintiff and Class members are accordingly entitled to injunctive relief.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**COUNT III**</u>
**Invasion of Privacy Under California's Constitution**

82.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class against Defendant.

83.     Plaintiff and Class members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class members' knowledge or consent.

84.     At all relevant times, by using the LinkedIn Insight Tag to record and communicate patients' personal identifiers alongside their confidential medical communications, Defendant intentionally invaded Plaintiff's and Class members' privacy rights under the California Constitution.

85.     Plaintiff and Class members had a reasonable expectation that their communications, identities, health information, and other data would remain confidential, and that Defendant would not intercept such information communicated on www.headway.co.

86.     Plaintiff and Class members did not authorize Defendant to record and transmit Plaintiff's and Class members' private medical communications alongside their personally identifiable and health information.

87.     This invasion of privacy was serious in nature, scope, and impact because it related to patients' private medical communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

88.     Accordingly, Plaintiff and Class members seek all relief available for invasion of privacy under the California Constitution.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   For a determination that this action is a proper class action;

B.   For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

C.   For an order declaring that Defendant's conduct violated the statutes referenced herein;

D.   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

E.   For an award of compensatory damages, including statutory damages where available, to Plaintiff and the Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

F.   For punitive damages, as warranted, in an amount to be determined at trial;

G.   For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

H.   For prejudgment interest on all amounts awarded;

I.   For injunctive relief as pleaded or as the Court may deem proper;

J.   For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

K.   For an order granting Plaintiff and Class members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated:  September 23, 2024          Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _Sarah N. Westcot_

1

2

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

3

4

5

6    *Counsel for Plaintiff*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit  2

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Sarah N. Westcot (State Bar No. 264916)<br>Bursor & Fisher, P.A., 701 Brickell Avenue, Suite 2100, Miami, FL 33131<br><br>TELEPHONE NO.: (305) 330-5512    FAX NO.: (305) 676-9006<br>EMAIL ADDRESS: swestcot@bursor.com<br>ATTORNEY FOR *(Name):* Plaintiff J.P. | *FOR COURT USE ONLY*<br><br>**Electronically Filed<br>by Superior Court of CA,<br>County of Santa Clara,<br>on 9/23/2024 3:35 PM<br>Reviewed By: L. Ayala<br>Case #24CV447940<br>Envelope: 16711620** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
STREET ADDRESS: 191 North First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME:

CASE NAME:
  J.P. v. LinkedIn Corporation

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [x] **Unlimited**<br>(Amount demanded exceeds $35,000) | [ ] **Limited**<br>(Amount demanded is $35,000 or less) | [ ] Counter    [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | **24CV447940**<br><br>JUDGE:<br><br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[x] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [x] is  [ ] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4. Number of causes of action *(specify):* Three
5. This case [x] is  [ ] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: September 23, 2024
Sarah N. Westcot
_____
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2024]
**CIVIL CASE COVER SHEET**
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courts.ca.gov*

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
   Damage/Wrongful Death
Uninsured Motorist (46) *(if the
   case involves an uninsured
   motorist claim subject to
   arbitration, check this item
   instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death) Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/
      Wrongful Death
Product Liability *(not asbestos or
   toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice–
      Physicians & Surgeons
   Other Professional Health Care
      Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip
      and fall)
   Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
   Intentional Infliction of
      Emotional Distress
   Negligent Infliction of
      Emotional Distress
   Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
   Practice (07)
Civil Rights (e.g., discrimination,
   false arrest) *(not civil
   harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice
      *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease
      Contract *(not unlawful detainer
      or wrongful eviction)*
   Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/
      Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open
   book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally
   complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
   Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent
   domain, landlord/tenant, or
   foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
   drugs, check this item; otherwise,
   report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court
      Case Matter
   Writ–Other Limited Court Case Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor Commissioner
      Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
   *(arising from provisionally complex
   case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of County)
   Confession of Judgment *(non-domestic
      relations)*
   Sister State Judgment
   Administrative Agency Award
      *(not unpaid taxes)*
   Petition/Certification of Entry of
      Judgment on Unpaid Taxes
   Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-
      harassment)*
   Mechanics Lien
   Other Commercial Complaint
      Case *(non-tort/non-complex)*
   Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
   Governance (21)
Other Petition *(not specified above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late Claim
   Other Civil Petition

**CIVIL CASE COVER SHEET**

**For your protection and privacy, please press the Clear
This Form button after you have printed the form.**

Print this form     Save this form     Clear this form

# Exhibit  3

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
LINKEDIN CORPORATION,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
J.P., individually and on behalf of all others similarly situated,

E-FILED
9/23/2024 3:35 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
24CV447940
Reviewed By: L. Ayala
Envelope: 16711620

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Superior Court of the State of California<br><br>County of Santa Clara, 191 North First Street, San Jose, CA 95113 | CASE NUMBER:<br>*(Número del Caso):* 24CV447940 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Sarah N. Westcot, Bursor & Fisher, P.A., 701 Brickell Avenue, Suite 2100, Miami, FL 33131, Tel.: (305) 330-5512

| DATE:<br>*(Fecha)* 9/23/2024 3:35 PM | Clerk of Court | Clerk, by<br>*(Secretario)* L. Ayala | , Deputy<br>*(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* LinkedIn Corporation

under: ☒ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)      ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |
|---|---|---|

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

Print this form    Save this form    Clear this form

# Exhibit 4

| Attorney or Party without Attorney:<br>SARAH N. WESTCOT (SBN 264916)<br>BURSOR & FISHER, P.A.<br>701 BRICKELL AVENUE SUITE 1420<br>MIAMI, FL 33131<br>Telephone No: 305-330-5512<br><br>Attorney For: Plaintiff | For Court Use Only<br><br>**Electronically Filed**<br>**by Superior Court of CA,**<br>**County of Santa Clara,**<br>**on 10/10/2024 4:53 PM**<br>**Reviewed By: R. Fleming**<br>**Case #24CV447940**<br>**Envelope: 16921130** |
| --- | --- |

| *Ref. No. or File No.:*<br>3546 Headway LinkedIn | |

| Insert name of Court, and Judicial District and Branch Court:<br>IN THE SUPERIOR COURT OF CALIFORNIA COUNTY OF SANTA CLARA |
| --- |

| *Plaintiff:* J.P.<br>*Defendant:* LINKEDIN CORPORATION |
| --- |

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>24CV447940 |
| --- | --- | --- | --- | --- |

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS; CIVIL CASE COVER SHEET; CLASS ACTION COMPLAINT; CIVIL LAWSUIT NOTICE; ADR INFORMATION PACKET

3. *a.* Party served: LINKEDIN CORPORATION
   *b.* Person served: Alex Jenkins, employee associate, CSC LAWYERS INCORPORATING SERVICE, REGISTERED AGENT FOR SERVICE OF PROCESS.

4. *Address where the party was served:* 2710 GATEWAY OAKS DRIVE, SACRAMENTO, CA 95833

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: Thu, Oct 03 2024 (2) at *(time)*: 01:55 PM
   (1)  [X]  (business)
   (2)  [ ]  (home)
   (3)  [ ]  (other) :

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a.  [ ]  as an individual defendant.
   b.  [ ]  as the person sued under the fictitious name of *(specify)*:
   c.  [ ]  as occupant.
   d.  [X]  On behalf of *(specify)*: LINKEDIN CORPORATION
       under the following Code of Civil Procedure section:
       [X] 416.10 (corporation)              [ ] 415.95 (business organization, form unknown)
       [ ] 416.20 (defunct corporation)      [ ] 416.60 (minor)
       [ ] 416.30 (joint stock company/association)  [ ] 416.70 (ward or conservatee)
       [ ] 416.40 (association or partnership)  [ ] 416.90 (authorized person)
       [ ] 416.50 (public entity)            [ ] 415.46 (occupant)
       [ ] other:



| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | PROOF OF<br>SERVICE<br>SUMMONS | *11920647*<br>*(6137764)*<br>Page 1 of 2 |
| --- | --- | --- |

| *Plaintiff:* J.P. | *Case Number:* |
| *Defendant:* LINKEDIN CORPORATION | 24CV447940 |

Recoverable cost Per CCP 1033.5(a)(4)(B)

7. **Person who served papers**
   a. Name:                   Nancy Graddy
   b. Address:               **FIRST LEGAL**
                                1939 HARRISON STREET, SUITE 818
                                OAKLAND, CA 94612
   c. Telephone number:      (415) 626-3111
   d. **The fee** for service was:    211.27
   e. I am:
      (1) ☐   not a registered California process server.
      (2) ☐   exempt from registration under Business and Professions Code section 22350(b).
      (3) ☒   a registered California process server:
         (i)   ☐ owner   ☐ employee   ☒ independent contractor
         (ii)   Registration No:   04-010, Placer County
         (iii)   County:   Placer

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

*N. graddy*

      10/03/2024
        *(Date)*                            *Nancy Graddy*

Judicial Council Form POS-010
Rule 2.150.(a)&(b) Rev January 1, 2007

**PROOF OF SERVICE SUMMONS**

*11920647*
*(6137764)*
**Page 2 of 2**

Exhibit 5

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**191 N. FIRST STREET**
**SAN JOSE, CA  95113-1090**

TO:      FILE COPY

RE:            **J.P. vs LinkedIn Corporation Class Action**
CASE NUMBER:      **24CV447940**

## ORDER DEEMING CASE COMPLEX AND STAYING DISCOVERY
## AND RESPONSIVE PLEADING DEADLINE

WHEREAS, the Complaint was filed by **J.P.** ("Plaintiff") in the Superior Court of California, County of Santa Clara, on **09-23-2024** and assigned to **Department 7** (Complex Civil Litigation), the **HONORABLE Charles F. Adams** presiding, pending a ruling on the complexity issue;

IT IS HEREBY ORDERED that:

The Court determines that the above-referenced case is complex within the meaning of California Rules of Court 3.400.  The matter remains assigned, for all purposes, including discovery and trial, to Department **7** (Complex Civil Litigation), the **HONORABLE Charles F. Adams** presiding.

The parties are directed to the Court's local rules and guidelines regarding electronic filing and to the Complex Civil Guidelines, which are available on the Court's website.

Pursuant to California Rules of Court, Rule 3.254, the creation and maintenance of the Master Service List shall be under the auspices of (1) Plaintiff **J.P.**, as the first-named party in the Complaint, and (2) the first-named party in each Cross-Complaint, if any.

Pursuant to Government Code section 70616(b), each party's complex case fee is due within ten (10) calendar days of this date.

Plaintiff shall serve a copy of this Order on all parties forthwith and file a proof of service within seven (7) days of service.

Any party objecting to the complex designation must file an objection and proof of service within ten (10) days of service of this Order.  Any response to the objection must be filed within seven (7) days of service of the objection.  The Court will make its ruling on the submitted pleadings.

The Case Management Conference remains set for **02/27/2025** at  2:30 p.m. dept. **7**.

Counsel for all parties are ordered to meet and confer in person at least 15 days prior to the First Case Management Conference and discuss the following issues:

1. Issues related to recusal or disqualification;
2. Issues of law that, if considered by the Court, may simplify or further resolution of the case, including issues regarding choice of law;
3. Appropriate alternative dispute resolution (ADR), for example, mediation, mandatory settlement conference, arbitration, mini-trial;
4. A plan for preservation of evidence and a uniform system for identification of documents throughout the course of this litigation;
5. A plan for document disclosure/production and additional discovery; which will generally be conducted under court supervision and by court order;
6. Whether it is advisable to address discovery in phases so that information needed to conduct meaningful ADR is obtained early in the case (counsel should consider whether

they will stipulated to limited merits discovery in advance of certification proceedings), allowing the option to complete discovery if ADR efforts are unsuccessful;

7. Any issues involving the protection of evidence and confidentiality;
8. The handling of any potential publicity issues;

Counsel for Plaintiff is to take the lead in preparing a Joint Case Management Conference Statement to be filed 5 calendar days prior to the First Case Management Conference, and include the following:

1. a brief objective summary of the case;
2. a summary of any orders from prior case management conferences and the progress of the parties' compliance with said orders;
3. significant procedural and practical problems that may likely be encountered;
4. suggestions for efficient management, including a proposed timeline of key events; and
5. any other special consideration to assist the court in determining an effective case management plan.

To the extent the parties are unable to agree on the matters to be addressed in the Joint Case Management Conference Statement, the positions of each party or of various parties should be set forth separately and attached to this report as addenda. The parties are encouraged to propose, either jointly or separately, any approaches to case management they believe will promote the fair and efficient handling of this case. The Court is particularly interested in identifying potentially dispositive or significant threshold issues the early resolution of which may assist in moving the case toward effective ADR and/or a final disposition.

**STAY ON DISCOVERY AND RESPONSIVE PLEADING DEADLINE**    Pending further order of this Court, the service of discovery and the obligation to respond to any outstanding discovery is stayed. However, Defendant(s) shall file a Notice of Appearance for purposes of identification of counsel and preparation of a service list. The filing of such a Notice of Appearance shall be without prejudice to the later filing of a motion to quash to contest jurisdiction. Parties shall not file or serve responsive pleadings, including answers to the complaint, motions to strike, demurrers, motions for change of venue and cross-complaints until a date is set at the First Case Management Conference for such filings and hearings.

This Order is issued to assist the Court and the parties in the management of this "Complex" case through the development of an orderly schedule for briefing and hearings. This Order shall not preclude the parties from continuing to informally exchange documents that may assist in their initial evaluation of the issues presented in this Case.

Plaintiff shall serve a copy of this Order on all the parties in this matter forthwith.

SO ORDERED.

Date: _____  10/23/2024 1:51:04 PM

_____

Hon. **Charles F. Adams**
Judge of the Superior Court

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line, (408) 882-2690 or the Voice/TDD California Relay Service, (800) 735-2922.

-----
Updated on 09/27/2024

2

# Exhibit 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NOTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| A.G., individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| THERAPYMATCH, INC. d/b/a HEADWAY, | |
| Defendant. | |

Plaintiff A.G. ("Plaintiff") brings this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant Therapymatch, Inc. d/b/a Headway ("Defendant" or "Headway"). Plaintiff brings this action based on personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## **NATURE OF THE ACTION**

1. Plaintiff brings this suit on behalf of all LinkedIn users who live in the United States and who scheduled a therapy appointment through the website www.headway.co (the "Website").

2. When individuals seek therapy, they often share sensitive personal information, including mental health history, personal struggles, and other confidential medical information. Data privacy is especially vital when booking therapy online, primarily due to the sensitive nature of this protected medical information. When patients engage in online therapy, they must be able to trust that their information is protected from unauthorized disclosure to third parties. When patients know their information is secure, they are more likely to pursue the support they

need without fear of judgment or exposure.  This is particularly important in therapy, where societal stigma around mental health can already be a barrier to accessing care.

3.     Information related to therapy appointments is protected by state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA").  Therapy providers are legally required to safeguard patients' health information.  This means that any data related to a patient's mental health, treatment history, and personal circumstances surrounding the reason for booking an appointment must be kept confidential and secure. Given these protections, patients reasonably expect that information related to their therapy appointments will remain confidential.

4.     However, unbeknownst to Plaintiff and members of the putative class, Defendant aided, employed, agreed, and conspired with LinkedIn to intercept these sensitive and confidential communications, including information concerning the medical conditions for which they were seeking therapy.  Defendant failed to receive consent for these interceptions.

5.     LinkedIn develops, owns, and operates "the world's largest professional network with more than 1 billion members in more than 200 countries and territories worldwide."[1] LinkedIn is also an advertising company, that touts its ability to deliver targeted marketing to specific users.

6.     Plaintiff brings this action on behalf of herself and the Class (as defined below) for equitable relief and to recover damages and restitution for: (i) violation of the Electronic Communications Privacy Act ("ECPA") 18 U.S.C. § 2511(1), *et seq.*; and (ii) negligence.

### **PARTIES**

7.     Plaintiff is an Illinois citizen who resides in Chicago, Illinois.  At all relevant

---

[1] LINKEDIN, ABOUT, https://about.linkedin.com/?trk=homepage-basic_directory_aboutUrl.

times, Plaintiff maintained an active LinkedIn account.

8.      Plaintiff scheduled several therapy appointments through the Website from approximately April through June, 2024.  When searching for a therapist on the Website, Plaintiff disclosed that she was looking for mental health treatment related to "relationship issues," "identity issues," "eating disorders," "trauma," and "stress."  Pursuant to the systemic process described herein, Defendant assisted LinkedIn with intercepting Plaintiff's communications, including those that contained personally identifiable information ("PII") and protected health information ("PHI").  This includes information related to the medical reasons for the appointment and the specific therapist she was seeing.  Defendant assisted LinkedIn's interceptions without Plaintiff's knowledge, consent, or express written authorization.

9.      By failing to receive the requisite consent, Defendant breached its duty of confidentiality and aided LinkedIn in unlawfully intercepting Plaintiff's PII and PHI.  Such acts are an egregious violation of Plaintiff's right to privacy.

10.     Defendant Therapymatch, Inc. is a Delaware corporation with a principal place of business in New York, New York.  Defendant owns and operates the website www.headway.co.  Defendant's Website is an online healthcare platform that matches patients with therapists for therapy appointments for various mental health conditions.  Defendant embedded a software code known as the LinkedIn Insight Tag on its Website, as described in more detail below.  Defendant embedded this tracking technology on its Website for advertising purposes.

## JURISIDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq* ("ECPA").

12.     This Court also has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least

one member of the Class, as defined below, is a citizen of a different state than Defendant, there

are more than 100 members of the Class, and the aggregate amount in controversy exceeds

$5,000,000 exclusive of interest and costs.

13.     This Court has personal jurisdiction over Defendant because Defendant conducts

substantial business in this District.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events or omissions giving rise to the claim occurred within this District.

## FACTUAL ALLEGATIONS

### A.     Mental Health Information is Sensitive and Confidential

15.     Defendant assisted LinkedIn with intercepting information that is sensitive,

confidential, and personally identifiable.

16.     Defendant is a healthcare company that hosts a website to connect patients with

therapists for mental health treatment.

17.     Under federal law, a healthcare provider may not disclose PII or PHI without the

patient's express written authorization.[2]

18.     The United States Department of Health and Human Services ("HHS") has

established a national standard, known as the HIPAA Privacy Rule, to explain the duties

healthcare providers owe to their patients.  "The Rule requires appropriate safeguards to protect

the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made

of such information without an individual's authorization."[3]

---

[2] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

[3] U.S. Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

19.     A healthcare provider violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses of causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."[4]

20.     The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity…and the individual obtained or disclosed such information without authorization."  *Id.*

21.     The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to its patients.

22.     Defendant further failed to comply with other HIPAA safeguard regulations as follows:

    a.     Failing to ensure the confidentiality and integrity of electronic PHI that Headway created, received, maintained and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

    b.     Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.R.F. Section 164.308(a)(1);

    c.     Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Headway in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

    d.     Failing to protect against reasonably anticipated threats or hazards to the

---

[4] 42 U.S.C. § 1320d-6.

security or integrity of electronic PHI in violation of 45 C.F.R. Section

306(a)(2);

e.      Failing to protect against reasonably anticipated uses of disclosures of

electronic PHI not permitted under privacy rules pertaining to individually

identifiable health information in violation of 45 C.F.R. Section

164.306(a)(3); and

f.      Failing to design, implement and enforce policies and procedures that

would establish physical and administrative safeguards to reasonably

safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

23.     Health care organizations regulated under HIPAA, like Defendant, may use third-

party tracking tools, such as the LinkedIn Insight Tag, *in a limited way* to perform analysis on

data key to operations.  They are not permitted, however, to use these tools in a way that may

expose patients' PHI to vendors.  As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use
> tracking technologies in a manner that would result in impermissible disclosures
> of PHI to tracking technology vendors or any other violations of the HIPAA
> Rules.  **For example, disclosures of PHI to tracking technology vendors for**
> **marketing purposes, without individuals' HIPAA-compliant authorizations,**
> **would constitute impermissible disclosures.**[5]

24.     The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy
> Rule but also may result in a wide range of additional harms to the individual or
> others.  For example, an impermissible disclosure of PHI may result in identity
> theft, financial loss, discrimination, stigma, mental anguish, or other serious
> negative consequences to the reputation, health, or physical safety of the
> individual or to others identified in the individual's PHI.  Such disclosures can
> reveal incredibly sensitive information about an individual, including diagnoses,

---

[5] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND
BUSINESS ASSOCIATES (THE "BULLETIN") (EMPHASIS ADDED), https://www.hhs.gov/hipaa/for-
professionals/privacy/guidance/hipaa-online-tracking/index.html.

frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[6]

25.     Plaintiff and Class Members face exactly the risks about which the government

expresses concern.  Defendant's unlawful conduct resulted in third parties intercepting

information regarding Plaintiff and Class Members scheduling consultations on the Website.

26.     The Bulletin goes on to make clear how broad the government's view of protected

information is.  It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, **or any unique identifying code**.[7]

27.     Crucially, that paragraph in the government's Bulletin continues:

> All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.  This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[8]

28.     Then, in July 2022, the Federal Trade Commission ("FTC") and the Department

of Health and Human Services ("HHS") issued a joint press release warning regulated entities

about the privacy and security risks arising from the use of online tracking technologies:

---

[6] *Id.* (emphasis added).

[7] *Id.* (emphasis added).

[8] *Id.* (emphasis added).

The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.[9]

29.     Therefore, Defendant's conduct, as described more thoroughly below, is directly

---

[9] Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

contrary to federal law and the clear pronouncements by the FTC and HHS.

**B.      LinkedIn's Platform and Business Tools**

30.      LinkedIn markets itself as "the world's largest professional network on the internet[.]"[10]  But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network.  LinkedIn has moved into the marketing and advertising space, and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[11]  Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[12]

31.      According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and ultimately, higher conversion rates."[13]  Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement.  To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[14]  LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience.  The ads [users] see on

---

[10] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441#.

[11] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[12] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

[13] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[14] LinkedIn, *supra* note 11.

LinkedIn are then targeted to provide content relevant to [the users]."[15]

32.     As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[16]

33.     The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, and LinkedIn Audience Network.[17]

34.     Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allows marketers and advertisers, including healthcare providers and insurance companies, to target potential customers.[18]

35.     For example, through the use of LinkedIn's Audience Network, marketers and

---

[15] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[16] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[17] *See id.*

[18] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[19]  According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[20]

     36.     In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[21]  That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[22]

     37.     According to LinkedIn, the LinkedIn Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[23]  LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[24]

     38.     LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which

---

[19] LinkedIn, Account Targeting, https://business.linkedin.com/marketing-solutions/ad-targeting.

[20] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

[21] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings#:~:text=And%20LinkedIn%20Marketing%20Solutions%20surpassed,revenue%20for%20the%20first%20time.

[22] Dencheva, *supra* note 12.

[23] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[24] LINKEDIN, LINKEDIN INSIGHT TAG FAQs, https://www.linkedin.com/help/lms/answer/a427660.

allows for the installation of its software.[25]  A critical feature allows the LinkedIn Insight Tag to track users, even when third-party cookies are blocked.[26]  LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[27]  Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn.  Doing so ensures that the third-party cookie-blocking functions of modern web browsers do not prevent LinkedIn from collecting data through its software.[28]  Instead, the LinkedIn Insight Tag is shielded with the same privacy exemptions offered to first-party cookies.

39.    When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

40.    These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

41.    The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies.  Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[29]

42.    For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a

---

[25] LINKEDIN, *supra* note 23.

[26] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where third party cookies are blocked.").

[27] *See id.*

[28]  *See id.*

[29] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

user's identity."[30]  Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[31]

43.     A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details.  Based on information it obtains through the LinkedIn Insight Tag, Defendant LinkedIn is able to target its account holders for advertising.

44.     LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully-disclosed information.  In fact, LinkedIn expressly warrants the opposite.

45.     When first signing up, a user agrees to the User Agreement.[32]  By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[33] and the Cookie Policy.[34]  For California residents, LinkedIn also publishes a California Privacy Disclosure.[35]

46.     LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[36]

47.     The Privacy Policy goes on to describe what data LinkedIn collects from various

---

[30] *See id.*

[31] *See id.*

[32] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[33] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[34] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

[35] LINKEDIN, CALIFORNIA PRIVACY DISCLOSURE, https://www.linkedin.com/legal/california-privacy-disclosure.

[36] LINKEDIN, PRIVACY POLICY, *supra* note 33.

sources, including cookies and similar technologies.  LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[37]

48.     However, LinkedIn offers an express representation: "**We will only collect and process personal data about you where we have lawful bases**."[38]

49.     Despite this explicit representation, LinkedIn intentionally intercepts and receives sensitive and unlawfully disclosed information in violation of state and federal privacy laws.

50.     Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

**C.     Defendant Assisted LinkedIn With Intercepting It's Patients PII and PHI**

51.     Headway is an online healthcare operator that connects patients with therapists. Upon entering the Website, Headway warrants that it will help "find your mental health provider."

52.     To begin, patients must provide Headway with certain information to find available therapists that will fit their mental health needs, including their location, concerns, and insurance carrier.

---

[37] *See id.*

[38] *See id.* (emphasis added).

**Figure 1:**



53. Unbeknownst to consumers, LinkedIn was tracking their activity the moment they entered the Headway Website.

54. For example, the LinkedIn Insight Tag was embedded on the Website, which allowed LinkedIn to intercept and record "click" events. Click events detail information about which page on the Website the patient was viewing as well as the selections they were making.

55. Through the LinkedIn Insight Tag, Defendant aided LinkedIn in intercepting consumers confidential information related to their therapy appointments in order to monetize that data for targeted advertising.

56. For example, when a patient provides their information, as shown above in Figure

1, and clicks "Find care," LinkedIn intercepts their confidential information through the LinkedIn Insight Tag.

**Figure 2:**

```
Data Sent: Concerns
        "signalType": "CLICK",
        "href": "",
        "domAttributes": {
                "elementSemanticType": null,
                "elementValue": null,
                "elementType": null,
                "tagName": "LI",
                "backgroundImageSrc": null,
                "imageSrc": null,
                "imageAlt": null,
                "innerText": "ADD/ADHD",
                "innerText": "Anxiety",
                "elementTitle": null,
                "cursor": "pointer"
```

57.     Patients then continue through Defendant's Website to select their preferred therapist.

58.     After providing additional details and confirming an appointment with their preferred therapist, Defendant aids Linkedn in intercepting that information through the LinkedIn Insight Tag as well.

**Figure 3:**



59.     As shown in Figure 4 below, LinkedIn intercepts several pieces of confidential information, including the name of the patient's therapist, the medical reasons for the therapy appointment, and the date and time of the appointment.

**Figure 4:**



"signalType": "CLICK",

"href": "/providers/arnold-fosah?preferredCarrierId=1&state=CALIFORNIA",

"domAttributes": {

    "elementSemanticType": null,

    "elementValue": null,

    "elementType": null,

    "tagName": "A",

    "backgroundImageSrc": null,

    "imageSrc": null,

    "imageAlt": null,

    "innerText": "ARNOLD FOSAH\nNurse Practitioner, RN, MSN, PMHNP-BC\nAccepts your insurance: Aetna\nSpecialties: ADD/ADHD, Anxiety, PTSD, Stress, Trauma\nAffirming\nHolistic\nWarm\nNext Available:\nJul 5th, 3:00pm",

    "elementTitle": null,

    "cursor": "pointer"

60.     These interceptions also included the li_sugr and lms_ads cookies, which LinkedIn utilizes to identify its account holders for targeted advertising.

61.     LinkedIn incorporated the information it intercepted from the Headway Website into its marketing tools to fuel its targeted advertising service.

62.     Plaintiff never consented, agreed, authorized, or otherwise permitted LinkedIn to intercept her confidential health information.

63.     By law, Plaintiff is entitled to privacy in her protected health information and confidential communications.  Defendant deprived Plaintiff of her privacy rights when it implemented a system that surreptitiously tracked and recorded Plaintiff's and other online consumers' confidential communications, personally identifiable information, and protected health information.

**CLASS ACTION ALLEGATIONS**

64.     Plaintiff seeks to represent a class defined as all LinkedIn account holders in the United States, excluding California, who booked a therapy appointment on www.headway.co (the "Class").

18

65.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

66.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

67.     Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

68.     **Numerosity.**  The members of the proposed Class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are thousands of individuals that are members of the proposed Class. Although the precise number of proposed members are unknown to Plaintiff, the true number of members of the Class are known by Defendant. Members of the Class may be notified of the pendency of this action by mail and/or publication through the records of Defendant and third-party LinkedIn.

69.     **Typicality.**  The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all members of the Class, scheduled a therapy appointment on the Website and had her confidential information disclosed to a third party.  The representative Plaintiff, like all members of the Class, has been damaged by Defendant's

misconduct in the very same way as the members of the Class through the privacy violations alleged herein.  Further, the factual bases of Defendant's misconduct are common to all members of the Class and represent a common thread of misconduct resulting in injury to all members of the Class.

70.    **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class.  These common legal and factual questions include, but are not limited to, the following:

a.  Whether Defendant intentionally tapped the lines of internet communication between patients and their healthcare provider;

b.  Whether Defendant's Website surreptitiously recorded personally identifiable information, protected health information, and related communications and subsequently, or simultaneously, disclosed that information to LinkedIn;

c.  Whether LinkedIn is a third-party eavesdroppers;

d.  Whether Defendant's disclosures of personally identifiable information, protected health information, and related communications constituted an affirmative act of communication;

e.  Whether Defendant's conduct, which allowed LinkedIn—an unauthorized person—to view Plaintiff's and Class Members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

f.  Whether Defendant violated Plaintiff's and Class Members' privacy rights by using the LinkedIn Insight Tag to record and communicate patients' confidential

medical communications; and

g. Whether Defendant breached its duty owed to Plaintiff and the Class by disclosing their PII and PHI to LinkedIn.

71. **Adequacy of Representation.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class. Plaintiff has no interests that are antagonistic to those of the Class.

72. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by members of the Class are relatively small compared to the burden and expense of individual litigation of her claims against Defendant. It would, thus, be virtually impossible for members of the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Class could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

73. In the alternative, the Class may be certified because:

(a) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendant;

(b) the prosecution of separate actions by individual members of the

Class would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede her ability to protect her interests; and/or

(c)    Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. § 2511(1), *et seq.*

74.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

75.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

76.    The ECPA protects both sending and the receipt of communications.

77.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

78.    The transmission of Plaintiff's PII and PHI to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

79.    The transmission of PII and PHI between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. §

2510(12).

80.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

81.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

82.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

83.    The following instruments constitute "devices" within the meaning of the ECPA:

    a.    The computer codes and programs LinkedIn used to track Plaintiff and Class Members communications while they were navigating the Website;

    b.    Plaintiff's and Class Members' browsers;

    c.    Plaintiff's and Class Members' mobile devices;

    d.    Defendant and LinkedIn's web and ad servers;

    e.    The plan Defendant and LinkedIn carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

84.    Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

85.    By utilizing and embedding the LinkedIn Insight Tag on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept,

the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

86.     Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications through the LinkedIn Insight Tag, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI to third parties, such as LinkedIn.

87.     Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII and PHI, including their treatment information.  This confidential information was then matched to patients' LinkedIn accounts and monetized for targeted advertising purposes.

88.     By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

89.     By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

90.     Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

91.     The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that

intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party.  HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[39]

92.     Plaintiff's information that Defendant disclosed to LinkedIn qualifies as IIHI, and Defendant violated Plaintiff's and Class Members' expectations of privacy.  Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendant used the wire or electronic communications to increase its profit margins.  Defendant specifically used the LinkedIn Insight Tag to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

93.     Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

94.     Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy through the LinkedIn Insight Tag.  Plaintiff and Class Members, all of whom are patients of Defendant, had a reasonable expectation that Defendant would not redirect their communications to

---

[39] 42 U.S.C. § 1320d-6.

LinkedIn without their knowledge or consent.

95.    The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

96.    As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

## COUNT II
### Negligence

97.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

98.    Defendant knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' PII and PHI, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, misused, and disclosed to unauthorized parties.

99.    As a provider of health care under the law, Defendant had a special relationship with Plaintiff and Class Members who entrusted Defendant to adequately protect their PII and PHI.

100.    Defendant knew that the PII and PHI at issue was private and confidential and should be protected as private and confidential.  Thus, Defendant owed a duty of care not to subject Plaintiff and Class Members to an unreasonable risk of unauthorized disclosure.

101.    Defendant knew, or should have known, of the risks inherent in collecting and storing PII and PHI and allowing it to be accessed by unauthorized third parties.

102.    Defendant's failure to take proper security measures to protect Plaintiff's and Class Members' PII and PHI created conditions conducive to a foreseeable risk of unauthorized access

and disclosure of such confidential information to unauthorized third parties. As described above, Plaintiff and Class Members are part of a foreseeable, discernable group that was at high risk of having their confidential information compromised, and otherwise wrongly disclosed if not adequately protected by Defendant.

103. Defendant had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII and PHI.

104. Defendant owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

105. Defendant systematically failed to provide adequate security for data in its possession or over which it had supervision and control.

106. Defendant, through its actions and omissions, unlawfully breached duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' PII and PHI within Defendant's possession, supervision, and control.

107. Defendant, through its actions and omissions, unlawfully breached duties owed to Plaintiff and Class Members by failing to have appropriate procedures in place to prevent dissemination of Plaintiff's and Class Members' PII and PHI.

108. Defendant, through its actions and omissions, unlawfully breached duties to timely and fully disclose to Plaintiff and Class Members that the PII and PHI within Defendant's possession, supervision, and control was improperly accessed by unauthorized third parties, the nature of this access, and precisely the type of information improperly accessed.

109. Defendant's breach of duties owed to Plaintiff and Class Members proximately

caused Plaintiff's and Class Members' PII and PHI to be compromised by being accessed by unauthorized third parties.

110.    As a result of Defendant's ongoing failure to adequately notify Plaintiff and Class Members regarding what type of PII and PHI has been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages.

111.    As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiff and Class Members to, inter alia, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

112.    In failing to secure Plaintiff's and Class Members' PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff's and Class Members' rights.  Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself and the Class.

113.    Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' PII and PHI, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct.   Plaintiff and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the alleged

Class, that the Court enter judgment in her favor and against Defendant as follows:

(a)     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative for the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any

and all issues in this action so triable as of right.

Dated: September 23, 2024        Respectfully Submitted,

By: */s/ Alec M. Leslie*
      Alec M. Leslie

**BURSOR & FISHER, P.A.**
Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: aleslie@bursor.com

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*pro hac vice* forthcoming)
Stephen A. Beck
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: swestcot@bursor.com
            sbeck@bursor.com

*Attorneys for Plaintiff*

Exhibit 7

1  COOLEY LLP
   JEFFREY M. GUTKIN (216083)
2  (jgutkin@cooley.com)
   AARTI REDDY (274889)
3  (areddy@cooley.com)
   AMY M. SMITH (287813)
4  (amsmith@cooley.com)
   MORGAN LEWIS (322205)
5  (melewis@cooley.com)
   JULIA M. IRWIN (352861)
6  (JIrwin@cooley.com)
   3 Embarcadero Center, 20th Floor
7  San Francisco, California 94111-4004
   Telephone:    +1 415 693 2000
8  Facsimile:    +1 415 693 2222

9  Attorneys for Defendant
   LinkedIn Corporation

10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                     COUNTY OF SANTA CLARA

13

14  J.P., individually and on behalf of all others       Case No. 24CV447940
    similarly situated,
15                                                        **COMPLEX – ASSIGNED TO JUDGE**
                    Plaintiff,                            **CHARLES F. ADAMS**
16
            v.                                            **DEFENDANT LINKEDIN CORPORATION'S**
17                                                        **NOTICE TO SUPERIOR COURT AND**
    LINKEDIN CORPORATION,                                 **PLAINTIFF OF REMOVAL TO UNITED**
18                                                        **STATES DISTRICT COURT FOR THE**
                    Defendant.                            **NORTHERN DISTRICT OF CALIFORNIA**
19

20

21

22

23

24

25

26

27

28

**PLEASE TAKE NOTICE** that on November 1, 2024, Defendant LinkedIn Corporation filed a Notice of Removal of this action in the United States District Court for the Northern District of California. Copies of the Notice of Removal and exhibits thereto, Civil Cover Sheet, Corporate Disclosure Statement, and Proof of Service filed and served concurrently with the Notice of Removal are attached hereto as **Exhibit A**.

Pursuant to 28 U.S.C. § 1446(d), this Notice "shall effect the removal and the State court shall proceed no further unless and until the case is remanded."

Dated: November 1, 2024                             COOLEY LLP


                                                    By:      /s/ *Jeffrey M. Gutkin*
                                                          Jeffrey M. Gutkin

                                                    Attorneys for Defendant
                                                    LINKEDIN CORPORATION